No. 87,989

STATE OF KANSAS, *Appellee*, v. MICHAEL A. BETHEL, *Appellant*.

66 P.3d 840

Opinion filed April 18, 2003.

*Reid T. Nelson*, capital appellate defender, argued the cause and was on the brief for appellant.

*John K. Bork*, assistant attorney general, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Michael A. Bethel appeals his convictions of one count of capital murder and two counts of premeditated first-degree murder. Pursuant to an agreement of the parties, Bethel waived his right to a jury trial, the case was tried to the bench on stipulated facts, and the State did not pursue the death penalty. Bethel was sentenced to two consecutive hard 50 terms of imprisonment and one concurrent hard 50 term, for a controlling term of 100 years.

Bethel contends that: (1) K.S.A. 22-3220 violates due process of law because it abolished the insanity defense which was "so rooted in the traditions and conscience of our people as to be ranked as fundamental"; (2) the Kansas *"mens rea"* approach to insanity unconstitutionally shifts the burden of proof to the defendant on the issue of intent once the State offers proof of the other elements; (3) Kansas' new "intent" approach to insanity violates the "heightened reliability" standard of the Eighth Amendment to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights; (4) the Kansas Legislature's abrogation of the insanity defense also violates the Eighth Amendment because it purports to permit the execution of persons who are exempt from such a penalty under *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989), and other precedent of the United States Supreme Court; (5) the Kansas death penalty scheme, see K.S.A. 21-4624 *et seq.*, in conjunction with K.S.A. 22-3220, violates due process and equal protection because it arbitrarily permits the punishment of certain classes of insane individuals while exempting similarly situated individuals from punishment altogether; (6) the Kansas death penalty scheme, in conjunction with K.S.A. 22-3220, violates the Eighth Amendment because it permits the arbitrary and capricious imposition of the death penalty where it was passed containing a variety of subjects; and (7) the trial court erred in failing to suppress his confession on the ground that he was actively delusional during the interview.

Because of the State's agreement not to pursue the death penalty, Bethel is not directly affected by it and cannot raise issues (4)

through (6) in this appeal. *State v. Papen*, 274 Kan. 149, 50 P.3d 37 (2002). Consequently, we will consider the four remaining issues.

The following stipulated facts were the basis for Bethel's bench trial:

"1. On February 7, 2000, shortly after 10:00 a.m., law enforcement officers were dispatched to a residence at 700 N. Summit Street in Girard, Crawford County, Kansas in response to a 911 . . . call made from that address.

"2. Upon entering the residence at 700 N. Summit, police officers discovered three victims suffering from what they perceived to be gunshot wounds. The two females Sherrill Davis and Waneta Boatright were pronounced dead at the scene. John A. Bethel (Defendant's father) was taken to Girard District Hospital where he was also pronounced dead. The autopsy on the three bodies showed that each died of gunshot wounds.

"3. Law enforcement officers observed Michael Bethel, the defendant, in the kitchen of the residence. When officers made contact with the defendant, they observed the defendant 'attempt to reach for [a] handgun on the table.' The defendant was in a position where he could reach the handgun. A law enforcement officer was in a position where he could have been shot by the defendant and was afraid for his life. The only other person in the house was the defendant's grandmother who was confined to bed.

"4. Mr. Bethel was taken into custody and transported to the Crawford County Sheriff's Office where he was subsequently interviewed by Bruce L. Adams, Senior Special Agent from the Kansas Bureau of Investigation, and Stu Hite, a Crawford County Sheriff's Detective. The defendant was *Mirandized* and agreed to talk to the officers. It is undisputed that this was a custodial interrogation.

"5. Hite and Adams conducted a second interview which was recorded on video with accompanying sound. After having been read his rights pursuant to *Miranda* and indicating that he understood them, defendant agreed to talk to the officers. Hite and Adams would testify that the content of the first unrecorded confession was virtually identical to the interrogation captured on video.

"6. Hite and Adams would testify that defendant admitted shooting Sherrill Davis in the head while she was talking on the telephone. The defendant's father, John 'Andy' Bethel came out of the bathroom and the defendant shot him with the same hand gun. While unsure how many times he shot his father, the defendant believed it was more than once. About half an hour later he became aware that a nurse, Waneta Boatwright, was in the residence. . . . She was facing west, looking out the window. The defendant stated that he approached her from behind, and shot her while she was facing away from him, with her back toward him.

"7. When asked why he killed his father, Ms. Davis and Ms. Boatright, the defendant explained that 'God told me to do it.' Hite and Adams would testify

that the defendant told them that he had thought about killing his father, as well as unspecified others, on many occasions. He also indicated that Davis and his father were 'bad' people who contributed to him having a 'rough twenty-three years of [his] life.'

"8. The defendant agrees that he intended to kill Sherrill Davis, John Andrew Bethel and Waneta Boatright, and that he premeditated the murders.

"9. The defense further proffers the report of Dr. Mark Cunningham, in which Dr. Cunningham opines that Mr. Bethel's mental state precluded him from understanding the difference between right and wrong or from understanding the consequences of his actions. This report is proffered for appellate purposes only, as Mr. Bethel and his defense counsel understand that this Court's prior rulings would render Dr. Cunningham's opinion inadmissible at trial. The parties agree that Dr. Cunningham's opinion does not constitute a defense to the charged crimes under the current version of K.S.A. 22-3220."

In its Memorandum Opinion overruling Bethel's motion to suppress the statement he gave to law enforcement officers on the day of the killings, the trial court made extensive findings of fact. The following narrative is condensed from the trial court's findings:

Before being transported to jail, Bethel was given *Miranda* warnings. While at the crime scene, Agent Bruce Adams of the Kansas Bureau of Investigation was told by Bethel's brother that Bethel had recently been hospitalized, had been diagnosed with paranoid schizophrenia, and was taking medication. Adams did not attempt to get any additional information about Bethel's mental condition before interviewing him.

At approximately 12:30 p.m., Adams gave *Miranda* warnings to Bethel before Adams and Stu Hite of the county sheriff's department began interviewing him. Bethel indicated that he understood his rights, agreed to talk to Adams and Hite, and completed a written waiver form. Bethel calmly and coherently admitted to the officers that he shot the three victims, and his account was consistent with the facts garnered from the crime scene. Bethel stated that his father and Sherrill Davis were responsible for his rough life and that God accordingly told him to kill them.

After approximately 1 hour, Bethel was permitted to use the restroom. When he returned and with his consent, the interview was conducted again. The second time it was videotaped. According to Adams, the questions and answers were essentially the same

in both interviews. The videotaped interview began at approximately 1:45 p.m. with Bethel being given *Miranda* warnings and ended at 2:27 p.m.

The trial court stated that the videotape "reveals that the defendant was calm, alert, lucid, spontaneous, rational, and responded appropriately to questions asked of him" and "did not appear to be responding to unseen stimuli." Bethel demonstrated his awareness of the purpose of the interview when he stated that he was there " 'for murder.' " On the videotape, Bethel described what was going on as " 'just bullshitting.' " Officer Hite believed that Bethel meant the interview was being conducted in a calm, conversational way and that the statement demonstrated Bethel did not feel ill at ease.

Dr. John Wisner, a psychiatrist who evaluated Bethel, testified that Bethel was actively psychotic at the time he was interviewed. According to Wisner, at the time of the interview, "the defendant believed that all three parties (Adams, Hite, and Bethel) were jointly involved in a 'stage set' in which the three individuals would soon metamorphosis [*sic*] into a new level of existence." Wisner testified that it is not possible to observe someone " 'being schizophrenic,' " hence denying any significance to Bethel's not responding to unseen stimuli. Wisner viewed Bethel's statement about " 'just bullshitting' " as "proof of defendant's avowed belief" that he, along with Adams and Hite, was going to metamorphose to another level of existence. Wisner believed that Bethel's statement was not voluntary because Bethel "was incapable of understanding the sum and substance of his confession."

Dr. Roy Lacoursiere, a psychiatrist and the State's expert rebuttal witness, was not permitted by the court to interview Bethel but reviewed the videotape, charts, records, and relevant reports. Lacoursiere noted the absence of a definitive diagnosis of paranoid schizophrenia in Bethel's medical records. On several earlier occasions, Bethel had been found to be suffering from a "major depressive disorder with substance abuse issues," and more recently he "was diagnosed as suffering from drug-induced psychosis." Lacoursiere disagreed with Wisner's opinion that symptoms of active psychosis are not observable, and Lacoursiere found no manifes-

tations of active psychosis in the record, including the videotape. Lacoursiere rejected the idea that Bethel's using the term "bull-shitting" suggested the presence of delusions, and Lacoursiere agreed with Officer Hite that Bethel was expressing his perception that he and the officers were "being conversational." Lacoursiere believed that Bethel understood that he was making a confession, as well as the consequences of doing so.

We first consider whether K.S.A. 22-3220 violates due process of law.

The insanity defense which has been abolished in Kansas is a ground for acquittal based on a defendant's lack of a blameworthy state of mind. Although the insanity defense is not expressly protected by the federal constitution, Bethel contends that its abolition constitutes a violation of due process because the insanity defense is so embedded in our legal traditions as to be a fundamental principle of criminal justice. A State's decision regarding the administration of justice is subject to proscription under the Due Process Clause of the Fourteenth Amendment to the United States Constitution if " 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' (Citations omitted)." *Patterson v. New York*, 432 U.S. 197, 201-02, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977).

K.S.A. 22-3220, according to Bethel's argument, violates due process by supplanting an insanity defense, which is a fundamental element of our criminal justice system. Before the current statute became effective, the rule in Kansas was that a defendant was not criminally responsible for his or her acts if, because of mental illness or defect, he or she lacked the capacity either (a) to understand the nature of his or her acts, or (b) to understand that what he or she was doing was prohibited by law. *State v. Ji*, 251 Kan. 3, 16, 832 P.2d 1176 (1992). The current statute provides:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense. The provisions of this section shall be in force and take effect on and after January 1, 1996." K.S.A. 22-3220.

The trial court rejected Bethel's contention that the insanity defense was a constitutionally protected fundamental principle. Hence, the trial court concluded that K.S.A. 22-3220 does not violate due process.

As the State points out, this court has considered K.S.A. 22-3220 in several recent cases. In *State v. Jorrick*, 269 Kan. 72, 81-83, 4 P.3d 610 (2000), the statute was considered in the context of diminished capacity. Jorrick, who had been drinking and smoking marijuana on May 4, 1997, when he committed murder, argued that the jury should have been instructed on diminished capacity. The court disagreed:

"On May 13, 1995, the legislature passed H.B. 2223, which went into effect on January 1, 1996. A significant portion of the bill concerned the removal of the insanity defense and its replacement with a straightforward *mens rea* approach. K.S.A. 22-3219 was amended to remove any reference to insanity and instead focused on a lack of the 'mental state required as an element of the offense charged.' As a result of the bill, K.S.A. 22-3220 was enacted . . . .

"K.S.A. 22-3220 prevents a defendant from raising insanity or diminished capacity as a defense. Kansas is among a minority of states that have done away with the insanity and diminished capacity defenses." 269 Kan. at 81.

The *Jorrick* court quoted the following passages from articles discussing the statutory change:

"In his article entitled *Insanity Denied: Abolition of the Insanity Defense in Kansas*, 8 Kan. J.L. & Pub. Pol'y 253, 254-55 (1999), author Marc Rosen discussed the changes and stated:

'With the adoption of Kan. Stat. Ann. § 22-3220, Kansas followed Montana, Idaho, and Utah to become the fourth state to legislatively abolish the insanity defense. In order to understand Kansas's new approach to insanity, one must understand the concept of *mens rea*. All crimes, except for those imposing strict liability, require the defendant to possess the illegal state of mind (*mens rea*). *Mens rea* refers to a defendant's moral culpability or "evil mind." More specifically, *mens rea* refers to criminal intent, or the specific mental element contained in the applicable criminal statute. Kansas provides that criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. . . .'

. . . .

'Consequently, in place of the affirmative defense of insanity, Kansas enacted the *"mens rea* approach." This approach permits a defendant to introduce expert psychiatric witnesses or evidence to litigate the intent elements of a crime. If

the evidence negates the requisite intent, the defendant is entitled to an acquittal. However, there is one major limitation on the defendant's ability to introduce evidence corroborating or showing the existence of a mental disease or defect. Such evidence is only admissible as it specifically relates to the requisite *mens rea* of the offense. Therefore, the defense cannot introduce evidence as to the existence of a mental disease or defect to litigate the defendant's mental condition in general. The evidence must relate specifically to the defendant's ability to possess the requisite *mens rea* of the offense.'

"Professor Raymond Spring discussed the reasons for the legislature's change in his article *Farewell to Insanity: A Return to Mens Rea*, 66 J.K.B.A. 38, 45 (1997):

'By focusing on *mens rea* jury confusion should be eliminated or at least reduced substantially. Jurors will be given the instruction defining the crime and its mental state component, as they always are and must be, and they will be told that any evidence they may hear relating to the mental condition of the defendant is to be considered on that issue alone. They will be asked to so state if they find that the defendant is not guilty solely because of mental disease or defect which rendered the defendant incapable of criminal intent. . . . *Like insanity, diminished capacity disappears as a separate defense. Mens rea* simply carries diminished capacity to the logical extreme. With the separate definition of insanity gone, there is no barrier to accepting the idea that if one's capacity can be so diminished by mental disorder as to destroy the capacity to form a special intent, then it may in some circumstances be so diminished as to destroy capacity to form any criminal intent at all. That has always been an illogical limitation, thought necessary only to avoid overlap of insanity and diminished capacity.' (Emphasis added)." *Jorrick*, 269 Kan. at 81-83.

The court found no error in the trial court's refusing to give an instruction on diminished capacity. 269 Kan. at 83.

In *State v. Albright*, 273 Kan. 811, 46 P.3d 1167, 1176-77 (2002), the defendant was convicted of premeditated first-degree murder. He argued for the first time on appeal that K.S.A. 22-3220 violated due process under the federal and state constitutions. Contending that consideration of the new issue was necessary to serve the ends of justice, he urged the court to exercise its power to consider it. The court declined to do so:

"Although the issue is a legal one, his argument is not persuasive. K.S.A. 22-3220 became effective January 1, 1996. With the adoption of K.S.A. 22-3220, insanity and diminished capacity defenses were eliminated in Kansas. See *State v. Jorrick*, 269 Kan. 72, 81, 4 P.3d 610 (2000). K.S.A. 22-3220 has not only been discussed by this court in *Jorrick*, but also has been subjected to extensive discussion in legal periodicals. See, Rosen, *Insanity Denied: Abolition of the Insanity*

*Defense in Kansas,* 8 Kan. J.L. & Pub. Pol'y 253, 254-55 (1999); Spring, *Farewell to Insanity: A Return to Mens Rea,* 66 J.K.B.A. 38, 45 (1997). We are not presented here with a new controlling ruling as in *Apprendi.* We find no exceptional circumstances that would convince us to depart from our traditional rule. We conclude the constitutionality of K.S.A. 22-3220 is not properly before us and will not be considered in Albright's appeal." 273 Kan. at 827.

In the present case, although conceding that *Albright's* disposition does not foreclose the present inquiry, the State asserts that the court's declining to consider the issue in *Albright* indicates that the lack of an insanity defense was not a denial of a fundamental right.

This court independently reviews Bethel's contention that the statute violates due process. The constitutionality of a statute is presumed and all doubts are resolved in favor of its validity. A statute will not be invalidated unless there is no reasonable way to construe it as constitutionally valid. *State v. Engles,* 270 Kan. 530, 531, 17 P.3d 355 (2001).

On appeal, Bethel principally relies on *Finger v. State,* 117 Nev. 548, 27 P.3d 66 (2001), *cert. denied* 534 U.S. 1127 (2002). The Nevada Supreme Court concluded that legal insanity is a fundamental principle of the criminal law of this country so that it is protected by the Due Process Clauses of the United States and Nevada Constitutions. 117 Nev. at 575. The Nevada legislature's attempt to abolish the insanity defense was held to be unconstitutional and unenforceable. 117 Nev. at 575.

The State principally relies on *State v. Korell,* 213 Mont. 316, 690 P.2d 992 (1984), *State v. Searcy,* 118 Idaho 632, 798 P.2d 914 (1990), and *State v. Herrerra,* 895 P.2d 359 (Utah 1995). The Supreme Courts of Montana, Idaho, and Utah each concluded that legal insanity is not a fundamental principle of American jurisprudence and, therefore, not protected by the Due Process Clauses of the federal and their state constitutions. Each of those legislatures' actions abolishing the insanity defense and substituting alternative procedures for considering a criminal defendant's mental condition at the time of the offense was held to be constitutional.

In *Korell,* the Montana Supreme Court rejected due process and cruel and unusual punishment challenges to its legislature's abolition of the insanity defense. 213 Mont. at 334. Korell's due process

argument was that "the insanity defense is so embedded in our legal history that it should be afforded status as a fundamental right." 213 Mont. at 327. The "primary guide in determining whether the principle in question is fundamental is . . . historical practice." *Montana v. Egelhoff*, 518 U.S. 37, 43, 135 L. Ed. 2d 361, 116 S. Ct. 2013 (1996).

Initially, the Montana court looked to the rulings of the United States Supreme Court. It noted that the Supreme Court has never afforded constitutional protection to an insanity defense. *Korell*, 213 Mont. at 327. Quoting the following excerpt from *Powell v. Texas*, 392 U.S. 514, 535-36, 20 L. Ed. 2d 1254, 88 S. Ct. 2145 (1968), the Montana court further noted that the Supreme Court views the significance of an insanity defense as properly left to the States:

" 'We cannot cast aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of *actus reus, mens rea*, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religions, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.' " 213 Mont. at 327-28.

The Montana court rejected Korell's contention that at common law the insanity defense had always been recognized. 213 Mont. at 329. The court found instead that differing views of the role of the insanity defense in the history of jurisprudence have been expressed by various courts and commentators, and it adopted the conclusion that insanity was not generally recognized as an independent ground for acquittal until the 19th century. 213 Mont. at 328-29. The following account of a "continuum of changing societal values and views" was given by the Montana court:

"The English jurist Stephen observed:
'. . . In very ancient times proof of madness appears not to have entitled a man to be acquitted, at least in case of murder, but to a special verdict that he committed the offense when mad. This gave him a right to a pardon. The same course was taken when the defense was killing by misadventure or in self-defense.' 2 Stephen, *A History of the Criminal Law of England* 151 (1883).

This early thirteenth century practice of pardoning the insane was acknowledged in our *Watson* decision and the historical discussion therein. Pardons were liberally granted and the practice represented a humane departure from earlier times of absolute liability for criminal acts.

"Development of the *mens rea* concept preceded recognition of the insanity defense. The Latin phrase *mens rea* literally translates as 'evil mind.' It has also been interpreted as guilty mind, evil intent or criminal intent. Enlightened medieval jurists developed the *mens rea* doctrine: without criminal intent, there can be no moral blameworthiness, crime or punishment. In the words of Henrici Bracton (d. 1268): 'For a crime is not committed unless the will to harm be present.' This principle has played a central role in all subsequent considerations of capacity, insanity, and moral and legal culpability.

"For centuries evidence of mental illness was admitted to show the accused was incapable of forming criminal intent. Insanity did not come to be generally recognized as an affirmative defense and an independent ground for acquittal until the nineteenth century. Morris, *The Criminal Responsibility of the Mentally Ill*, 33 Syracuse L.R. 477, 500 (1982); American Medical Association, *The Insanity Defense in Criminal Trials and Limitations of Psychiatric Testimony*, Report of the Board of Trustees, at 27 (1983). The defense grew out of the earlier notions of *mens rea*." *Korell*, 213 Mont. at 328-29.

The Montana court distinguished "[t]hree older state court decisions [that had] found state statutes abolishing the insanity defense to be unconstitutional. *State v. Lange* (1929), 168 La. 958, 123 So. 639; *Sinclair v. State* (1931), 161 Miss. 142, 132 So. 581; *State v. Strasburg* (1910), 60 Wash. 106, 110 P. 1020." *Korell*, 213 Mont. at 329. The earlier decisions were determined to be distinguishable on the ground "that they interpret statutes that precluded *any* trial testimony of mental condition, including that which would cast doubt on the defendant's state of mind at the time he committed the charged offense," where the challenged Montana statutes "expressly allow evidence of mental disease or defect to be introduced to rebut proof of defendant's state of mind." [Citation omitted.] 213 Mont. at 329.

The Montana court also found support for its position in *Leland v. Oregon*, 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002 (1952), in which an Oregon statute was upheld that required the defendant to prove insanity beyond a reasonable doubt. The Supreme Court rejected the argument that due process required any particular insanity defense. 343 U.S. at 797-99.

In *Searcy*, the Idaho Supreme Court, echoing the reasoning of the Montana court in *Korell*, also concluded that due process does not constitutionally mandate an insanity defense and that the Idaho statute did not deprive a criminal defendant of due process rights. *Leland v. Oregon* was cited for its rejection of the argument that due process requires a particular insanity test. *Searcy*, 118 Idaho at 636-37. The passage from *Powell v. Texas* quoted in *Korell* was repeated, with the addition of this lead-in sentence: "[T]his court has never articulated a general constitutional doctrine of *mens rea*." *Searcy*, 118 Idaho at 636 (quoting *Powell*, 392 U.S. at 535-36).

In addition, the Idaho court stated:

"Justice Marshall, in his *Powell* opinion, stated that 'nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms.' 392 U.S. at 536 . . . . Justice Rehnquist recently reaffirmed this view in his dissenting opinion in *Ake v. Oklahoma*, 470 U.S. 68, 91, 105 S. Ct. 1087, 1100, 84 L. Ed. 2d 53, 71 (1985), in which he wrote:

'[I]t is highly doubtful that due process requires a state to make available an insanity defense to a criminal defendant but in any event if such a defense is afforded the burden of proving insanity can be placed on the defendant.' " *Searcy*, 118 Idaho at 636.

In *Herrera*, the Utah Supreme Court also concluded that federal due process was not violated by the legislature's limiting consideration of mental illness to the question whether the defendant lacked the mental state required as an element of the charged crime. 895 P.2d at 366. The Utah court cited *Korell* and *Searcy*— as well as the cases cited by the Montana and Idaho courts—and embraced the reasoning of the earlier decisions. 895 P.2d at 363-66.

In addition, the Utah court quoted from dissenting and concurring opinions in *Foucha v. Louisiana*, 504 U.S. 71, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992). Foucha had been found not guilty of aggravated burglary and illegal discharge of a firearm by reason of insanity, and he was committed. Approximately 4 years later, the defendant was reported to be "presently in remission from mental illness," but possessed of an untreatable antisocial personality. 504 U.S. at 74-75. Under Louisiana law, the defendant's confinement was continued because he did not prove that he was not dangerous.

On *certiorari*, a majority of the Supreme Court held that the Louisiana statutory provision violated due process. 504 U.S. at 81-83. Focusing on the dissenting and concurring opinions in *Foucha*, the Utah court stated:

"On an uncontested point, Justice Kennedy acknowledged, 'States are free to recognize and define the insanity defense as they see fit.' [504 U.S.] at 96 . . . (Kennedy, J., dissenting). In a concurring opinion, Justice O'Connor emphasized that the Court's holding placed no new restriction on the 'States' freedom to determine whether and to what extent mental illness should excuse criminal behavior. The Court does not indicate that States must make the insanity defense available.' [504 U.S.] at 88-89 . . . (O'Connor, J., concurring). [Citation omitted.]" *Herrera*, 895 P.2d at 365.

The Utah court also observed that the States have taken a number of different paths in dealing with mental illness and criminal behavior: "A majority of states follow some form of the *M'Naghten* test; others have adopted variations of the Model Penal Code definition. Six states have added the 'irresistible impulse' test, and three states now use the mens rea model. [Citations omitted.]" 895 P.2d at 365. In defense of its minority position as one of the few states using the *mens rea* model, the Utah court noted that the American Medical Association recommended adoption of the *mens rea* model. 895 P.2d at 365 (citing Committee Report, *Insanity Defense in Criminal Trials and Limitation of Psychiatric Testimony*, JAMA 2967 [June 8, 1984]).

In *Finger*, the Nevada Supreme Court rejected the reasoning of the courts of Montana, Idaho, and Utah. 117 Nev. at 571-75. Nevada "conclude[d] that legal insanity is a well-established and fundamental principle of the law of the United States. It is therefore protected by the Due Process Clauses of both the United States and Nevada Constitutions. The Legislature may not abolish insanity as a complete defense to a criminal offense." 117 Nev. at 575.

The key difference between the reasoning of the Nevada court and the courts of Montana, Idaho, and Utah is their differing views of *mens rea*. To the Nevada court, wrongfulness is an integral element of the concept of *mens rea*. It rejected "the concept inherent in the *mens rea* model," that had been approved by Montana, Idaho, and Utah, in which "knowledge that one's actions are

'wrong' is not generally an element of a crime, even a specific intent crime, and it is not a requirement of murder." 117 Nev. at 568. Noting that its statutory definition of murder is an unlawful killing, the Nevada court instead embraced the concept of *mens rea* as intent to act knowing that the act is wrong. 117 Nev. at 574-75. "It is because legal insanity is a corollary" of that concept of *mens rea* that, according to the Nevada court, "legal insanity is a fundamental principle under the Due Process Clause." 117 Nev. at 569. Thus, in reviewing historical legal practice, the Nevada court looked for examples of the protection of defendants incapable of understanding that an act is unlawful and found a fundamental principle of law. 117 Nev. at 568-69. The courts of Montana, Idaho, and Utah, in contrast, reviewed historical legal practice for examples of insanity defenses and found that the defense was not a fundamental principle of law.

Maintaining that "the general concept of legal insanity in relation to criminal culpability is centuries old," the Nevada court acknowledged that "the definition of what constitutes legal insanity and how it should be presented to a jury under the American legal system is not so ancient." 117 Nev. at 556. According to the Nevada court, "[i]t first became a topic of intense legal discussion as a result of a singular instance in English history," *i.e.*, Daniel M'Naghten's attempt to assassinate the British prime minister in 1843. 117 Nev. at 556.

The Nevada court noted that an American Bar Association committee on criminal law rejected the *mens rea* model:

" 'This approach, which would permit evidence of mental condition on the requisite mental element of the crime but eliminate mental nonresponsibility as an independent exculpatory doctrine, has been proposed in several bills in Congress and adopted in Montana, Idaho and Utah. The ABA has rejected it out of hand. Such a jarring reversal of hundreds years of moral and legal history would constitute an unfortunate and unwarranted overreaction to the Hinckley verdict.' American Bar Association, Standing Committee on Association Standards for Criminal Justice, Report to the House of Delegates, August, 1984, Standard 7-6.1, Commentary P. 327." *Finger*, 117 Nev. at 569-70.

With regards to the Montana, Idaho, and Utah courts' drawing sustenance from several statements in United States Supreme

Court opinions, the Nevada court conceded that Justice Rehnquist's single-sentence comment in *Ake v. Oklahoma*, 470 U.S. 68, 91, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985), supports the decisions in *Korell, Searcy,* and *Herrera. Finger,* 117 Nev. at 571-72. The Nevada court, however, pointed out that the sentence appeared in a dissenting opinion and, then further indicated that Justice Marshall's commentary in *Powell* about not casting aside the "centuries-long evolution of the collection of inter-locking and overlapping concepts," including *mens rea,* which is quoted in each of the other States' opinions did not support those opinions. 117 Nev. at 572.

The Nevada court found that the "ideas embodied in *Powell* regarding giving the states discretion on the procedural method for determining legal insanity" were expressed in *Leland* as well. 117 Nev. at 572. Mainly because the Supreme Court in *Leland* treated the concepts of legal insanity and *mens rea* as intertwined, the Nevada court saw in *Leland* the implication "that legal insanity is a fundamental principle of our system of justice." *Finger,* 117 Nev. at 572 (citing *Leland,* 343 U.S. at 799).

Like the defendant in the Nevada case, Bethel contends, as the foundation for his position, that due process requires that wrongfulness be an essential component of *mens rea.* The *Finger* court rejected the suggestion that the Nevada statute could be construed so that *mens rea* includes an element of wrongfulness: "[T]he *mens rea* model, adopted by the Nevada Legislature, assumes that 'wrongfulness' is never an element of intent, regardless of the crime." 117 Nev. at 568. Bethel has provided no argument or authority to this court to show that the *mens rea* model adopted by the Kansas legislature differs on this basic premise.

The incompatibility of the *mens rea* model with a concept of *mens rea* that includes an element of wrongfulness was a crucial factor in the Nevada court's decision:

"Finally we note that these opinions appear to assume that wrongfulness, that is the knowledge that you are acting in an unauthorized manner, is not a necessary component of the crime of murder. In fact, *Herrera* specifically indicates that the only element of intent in murder is the intent to kill a human being. It is this approach that distinguishes the *mens rea* model. But murder is generally not

defined as just the killing of another human being. In Nevada, as in most states, murder requires something more than the intent to kill. Nevada defines murder as the 'unlawful killing of a human being, with malice aforethought, either express or implied . . .' NRS 200.010 (emphasis added). Malice is defined in NRS 200.020 Express malice involves the deliberate intention to unlawfully take away the life of a fellow creature, while malice is implied when, for example, the circumstances of the killing show an abandoned and malignant heart." *Finger*, 117 Nev. at 574.

However, in Kansas, malice is not a requisite element of murder. In *State v. McCown*, 264 Kan. 655, 957 P.2d 401 (1998), McCown argued that notwithstanding the legislature deleting "malicious" from the definition of second-degree murder, malice remained an indispensable element of murder. He contended that "without the element of malice, the statute is vague in that it does not clearly define the standards of guilt, thereby denying him due process of law." 264 Kan. at 661. We disagreed, finding no merit in his argument. In Kansas, the only intent required is the intent to kill a human being. "Maliciously" killing another human being is no longer an element of murder in Kansas. 264 Kan. at 661-62.

In the opening sentence of his article about K.S.A. 22-3220, *Farewell to Insanity*, 66 J.K.B.A. 38 (May 1977), Professor Raymond Spring seemed to embrace the concept of *mens rea* as an evil-meaning mind. He began: "For nearly 2,000 years there has been legal recognition that only conduct that is the product of a blameworthy state of mind is appropriately classified as criminal and *that blame can only be affixed where the mind is capable of understanding the law's commands.*" (Emphasis added). 66 J.K.B.A. at 38. Then there was a period of confusion and frustration following *M'Naghten's Case*, 10 Clark & F. 200, 8 Eng. Rep. 718 (1843), which, according to Spring, ended in Kansas with the 1995 enactment of K.S.A. 22-3220. 66 J.K.B.A. at 38-39. K.S.A. 22-3220 was said, by Spring, to return "consideration of the matter of a defendant's possible mental disorder to the place assigned that issue throughout the development of the law prior to *M'Naghten.*" 66 J.K.B.A. at 45. It is surprising then to read on and learn that the author, the chief advocate of the legislation according to Bethel, believed that in applying 22-3220 jurors would be given only the usual elements instruction and "told that any evidence they may

hear relating to the mental condition of the defendant is to be considered on that issue alone." 66 J.K.B.A. at 45. In a case similar to the present one where a defendant has stated that he or she thought about it ahead of time and intended to kill his or her victims, a jury's deliberation would need to go no further than those two elements and there would be no consideration of whether wrongfulness was inherent in the defendant's intent.

Spring wrote that "jury confusion should be eliminated or at least reduced substantially" under K.S.A. 22-3220. 66 J.K.B.A. at 66. No doubt, he was correct because the range of the jury's consideration has been significantly narrowed. Whether it has been contracted further than constitutionally permissible is the question. Speaking of the Montana formula as the first *mens rea* approach to be developed, Spring stated: "While it had long since been settled that questions regarding the mental condition of a criminal defendant could not constitutionally be eliminated from the determination of guilt because of the link to *mens rea*, it was also clear that there was no constitutional requirement for a separate defense of insanity." 66 J.K.B.A. at 42. In accord, he distinguished the early cases from Louisiana, Mississippi, and Washington as finding unconstitutionality due to statutory prohibitions on "the use of evidence of mental disorder as a defense in a criminal trial." 66 J.K.B.A. at 44. In other words, Spring was of the opinion that the admissibility of evidence of mental disorder, no matter how limited in its application, satisfies due process requirements.

Bethel contends that the insanity defense is an ancient concept in our legal practice and that Spring was mistaken in his belief about the insanity defense as previously employed in this state being a 19th-century innovation. Spring's view, however, is in line with historical practice as outlined by the courts of Montana, Idaho, Utah, and even Nevada and the sources they cited. Commentators generally agree that it was not until the *M'Naghten* case of 1843 that the focus shifted from moral good and evil to an insanity defense and the cognitive ability of a defendant to know right from wrong. See, Hawkins-Leon, *"Literature as Law": The History of the Insanity Plea and a Fictional Application within the Law &*

*Literature Canon,* 72 Temp. L. Rev. 381, 389-427 (1999), and sources cited therein.

We find the reasoning of the Supreme Courts of Montana, Idaho, and Utah persuasive. We conclude that the affirmative insanity defense is a creature of the 19th century and is not so ingrained in our legal system to constitute a fundamental principle of law. As stated in *State v. Herrera,* 895 P.2d 359, 365-66 (Utah 1995):

> "The Montana high court has also determined that there is no constitutional right to have an independent insanity defense. *Korell,* 690 P.2d at 996. There, the court responded to the historical argument as follows: 'We reject appellant's contention that from the earliest period of the common law, insanity has been recognized as a defense. What we recognize is that one who lacks the requisite criminal state of mind may not be convicted or punished.' [690 P.2d] at 999. Utah's *mens rea* model provides this minimum standard of protection to defendants. We agree with *Korell* that the common law and our basic principles of ordered liberty are not offended by the *mens rea* model."

The Utah Supreme Court went on to note that Utah had not abolished the insanity defense but allowed the defendant to present evidence of mental illness to negate the required state of mind. Likewise, the Kansas Legislature has not abolished the insanity defense but rather redefined it. Pursuant to K.S.A. 22-3220, it is a defense if the defendant, as a result of a mental illness or defect, lacks the *mens rea* for the crime charged. A defendant is permitted to present expert evidence to that effect. Due process does not mandate that a State adopt a particular insanity test. See *Leland,* 343 U.S. at 797-99. K.S.A. 22-3220 does not violate the defendant's right to due process under the United States or Kansas Constitutions.

Bethel also contends that the Kansas *"mens rea* approach" to insanity unconstitutionally shifts the burden of proof to the defendant on the issue of intent once the State offers proof of the other elements.

Bethel cites *Leland,* 343 U.S. 790, as setting the standard for constitutionality for shifting of the burden of proof. He contends that K.S.A. 22-3220 runs afoul of the *Leland* rule. Examination of *Leland,* however, shows that the statutory scheme does not depart

from accepted practice. Under Oregon law, the insanity defense was an affirmative defense in that it placed the burden of proving insanity on the defendant. Defendant's standard of proof was beyond a reasonable doubt. Leland contended that the statutory scheme violated due process. The Supreme Court held that due process was not violated by the burden or the standard of proof for insanity as long as the prosecutor was required to prove beyond a reasonable doubt every element of the offense charged. 343 U.S. at 798-99.

Under K.S.A. 22-3220, there is no backing away from the requirement that the State prove every element of the offense charged by proof beyond a reasonable doubt. The State must do so in order to gain a conviction. The statute provides simply that a defendant may present evidence tending to show that, as a result of mental disease or defect, he or she lacked the mental state required as an element of the offense charged.

Bethel's final constitutional challenge is whether Kansas' new "intent approach" to insanity violates the Eighth Amendment to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights.

Bethel's premise is that punishing a person who committed an offense as a result of mental disease is tantamount to punishing the person because he has a mental disease. He cites *Robinson v. California*, 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962), in which the Supreme Court struck down on Eighth Amendment grounds a statute that effectively made the status of narcotic addiction a criminal offense. Bethel's premise is faulty. K.S.A. 22-3220 does not expressly or effectively make mental disease a criminal offense. It does not violate the Eighth Amendment to the United States Constitution or § 9 of the Kansas Constitution Bill of Rights.

Bethel also argues that the trial court erred in failing to suppress the confession on the ground that he was actively delusional during the interview.

After viewing the videotaped interrogation of Bethel and hearing testimony of the interviewing officers and expert psychiatric witnesses for defendant and the State, the trial court concluded that

Bethel's statements to the interrogating officers were freely and voluntarily given. Following *State v. McCorkendale*, 267 Kan. 263, 270-73, 979 P.2d 1239 (1999), the trial court considered these factors: Bethel's mental condition; the manner and duration of the interrogation; his ability on request to communicate with the outside world; his age, intellect, and background; and the fairness of the officers in conducting the investigation.

Bethel's position as stated in his brief is that he "was insane at the time of the interview," and, as a result, under Kansas law his statements should have been suppressed. Bethel's contention, however, is at odds with established law of this state. "Mental disability alone is not determinative of voluntariness" of a confession. *State v. Caenen*, 270 Kan. 776, Syl. ¶ 3, 19 P.3d 142 (2001). In all cases, including cases of mental disorders or illness, where the voluntariness of a confession is at issue, the totality of the circumstances is examined. 270 Kan. at 783-84. The factors that have been identified as representing the totality of circumstances and which are to be taken into consideration are those that the trial court applied. See 270 Kan. at 784. On appeal, the trial court's ruling will be upheld if supported by substantial competent evidence. 270 Kan. at 783.

Bethel's mental condition. With regard to the first factor, the accused's mental condition, the trial court reached the following conclusions:

"The Court has closely reviewed the videotape of the defendant's statement. The videotape speaks for itself. The defendant is observed on the tape to be calm, lucid, rational, spontaneous, and alert. The defendant is observed to respond appropriately to questions posed to him. He does not appear to be distracted, indeed, Mr. Bethel answers questions spontaneously, which demonstrates that he is not pausing to receive answers from a higher entity. Mr. Bethel is never observed in any manner to be responding to unseen stimuli. Moreover, the defendant displays an awareness of the purpose of the interview (murder) and of the nature of the alleged act (ugly). Mr. Bethel is able to accurately recount his actions on the day in question and he is seen correcting his interrogators when necessary.

". . . [T]he videotape clearly demonstrates that the defendant was rational and alert during his interview. The defendant demonstrates an awareness of self and an awareness of his surroundings.

"The Court is mindful of the defendant's averment that it is impossible to observe someone 'being schizophrenic.' However, as Dr. Lacoursiere pointed out,

one would generally expect an outward manifestation of psychotic behavior. Moreover, prior to Dr. Wisner's diagnosis in the instant matter, the defendant had never been definitively diagnosed with paranoid schizophrenia. The defendant's most recent diagnosis (Hawthorn Center in December, 1999) was for drug-induced psychosis, the symptoms of which are consistent with paranoid schizophrenia.

"The videotape simply does not support the defendant's premise that he was suffering from paranoid schizophrenia at the time of the statement. There is no indication in the videotape that the defendant was hallucinating or was not intending to tell what happened. Even though the defendant freely stated that 'God' told him to do it, Mr. Bethel never stated 'God' was talking to him at the time of the interview and was therefor dictating his answers.

"As previously noted, the defendant places much significance in the statement that 'we're all just bullshitting here.' Dr. Wisner believes this statement is strongly indicative of the defendant's delusional belief that the three parties (Adams, Hite, and Mr. Bethel) are jointly going to transcend into a different level of existence. Yet Dr. Wisner fails to explain just how this particular statement corroborates the defendant's avowed belief of an impending group metamorphosis to another plane.

"Conversely, both Dr. Lacoursiere and Hite believe that the statement evidences the defendant's comfort level with the interview process. Additionally, Dr. Lacoursiere believes the statement is a colloquial term employed by the defendant to describe the 'conversational' nature of the interview.

"The videotape clearly shows that Dr. Lacoursiere and Hite are correct in their assessment of the use of the phrase. The tenor of the interview and the manner in which the defendant uses the phrase clearly demonstrate that the defendant utilized the terminology to define what Mr. Bethel believed to be a low-key, conversational, and comfortable process. The videotape does not support Mr. Bethel's claim. The Court cannot discern any hidden meaning in any of the defendant's comments expressed during the interview. The defendant appears to be 'straight-forward' in all of his responses to questions posed by Adams and Hite.

"In summary, the Court cannot ascertain any disorganized thought by the defendant. He answers appropriately, corrects his interrogators, and relates a version of the event that matches the known crime scene. The defendant is not observed responding to unseen stimuli and never states that God is controlling his answers. The defendant accurately relates his activities on the day in question and appears to understand the underlying purpose of the interview. He understands the gravity of the situation and is able to assess the morality of his alleged offenses. In short, the defendant appears to be capable of knowingly and voluntarily rendering a statement."

Bethel contends that the trial court failed to properly evaluate certain statements made by him during the videotaped interview that demonstrate active psychosis. In making the argument, Bethel

singles out four statements. One—God told him to kill the victims—was thoughtfully considered by the court and rejected as evidence of active psychosis during the interview, as distinguished from the time of the shootings. Two others—that Bethel thought he would be released and that his message to the victim's families was 'reincarnation'—are very questionable interpretations of the videotaped interview. Examination of the videotaped interview shows that the statement singled out as supposedly showing that Bethel expected to be released had to do with defendant's thoughts before he was taken into custody. It was his response to a question about what he thought after shooting the victims. He said he thought about going to his father's farm to build a fire and go fishing. The purported message to victim's families about reincarnation consisted in whole of one of the officer's attempting to prompt Bethel to talk about reincarnation. Bethel's response was noncommittal. The fourth statement singled out as supposedly showing active psychosis was Bethel's saying that if he were released he would not be a danger to good, *i.e.*, nondeceitful people. Bethel does not explain why this statement in particular demonstrates active psychosis, nor is it self-evident.

Examination of the videotaped interview shows that there is substantial competent evidence supporting the trial court's conclusion that Bethel's statements were not unknowing or involuntary due to his mental condition at the time of the interview. Bethel does not question the trial court's determinations regarding the other factors—the manner and duration of the interrogation; Bethel's ability on request to communicate with the outside world; his age, intellect, and background; and the fairness of the officers in conducting the investigation. Examination of the videotaped interview shows, too, that the trial court's ruling in those respects is supported by substantial competent evidence.

Finally, Bethel contends that the trial court's ruling is contrary to principles established in *Colorado v. Connelly*, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986), and *Blackburn v. Alabama*, 361 U.S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274 (1960). These benchmarks with regard to the effect of mental illness on the admissibility of confessions were cited by this court in *Caenen,* as well as earlier

cases, and have been incorporated into this state's totality-of-circumstances analysis. See 270 Kan. at 784-85.

Affirmed.

ABBOTT, J., not participating.

DAVID S. KNUDSON, J., assigned■