Johnson, J., dissenting:
I dissent. To effect synergy with the majority, I will address each of its issues in turn, including those with which I agree, followed by the unassigned error of unconstitutionally inflicting the cruel and/or unusual punishment of death.
ISSUE #1: PROSECUTORIAL ERROR
I agree with the majority's holding that it is within the prosecutor's permissible latitude to object on the ground that the defense's closing argument is about to go beyond the admitted evidence, even where the objection is based on the prosecutor's erroneous understanding of the law. I disagree, however, with the majority's suggestion that bad faith or ill will can never play any role in the error analysis. I would submit that a prosecutor does not have the wide latitude to intentionally seek to lure the trial court into erroneously excluding permissible defense arguments. Such bad faith conduct, manifesting ill will, does, indeed, constitute prosecutorial error. But I do not discern that the prosecutor in this case crossed that line.
ISSUE #2: JUDICIAL MISCONDUCT
I agree with the majority on its assessment of the judge's remarks to the third panel of venire persons warning against blurting out personal opinions. Although a more articulate admonition would have included the clarification that panel members could individually advise the court of their respective personal concerns about the death penalty outside the presence of the others that omission in this context did not rise to the level of misconduct.
Likewise, I agree with the majority that it would have been better if the venire panel had not heard the trial judge ask the defense to pick up the pace. See State v. Kemble , 291 Kan. 109, 114, 238 P.3d 251 (2010) ("[A] trial judge should be cognizant that jurors afford the presiding judge a great deal of respect and ' "can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word." ' [Citation omitted.]"). But I discern no judicial misconduct.
Further, I agree with the majority's finding of error regarding the third alleged incident of judicial misconduct during which the district judge told the jury that he normally did not give the instruction on counsel's statements not being evidence after the opening statements. The majority correctly discerns that, in context, the judge's comment brought special attention to the instruction and the jury could have concluded that the extra instruction was specifically aimed at the credibility of the defense opening statement.
With respect to the judge's questioning of the deputy, I would concur with the majority's determination that, although the better practice would have been for the district judge to ask the prosecutor to seek clarification *135 of the testimony, there was no misconduct here. The judge's questions did not suggest partiality toward the State. Indeed, the questioning could be viewed as having cast some doubt on the deputy's thoroughness or expertise.
The alleged judicial misconduct set forth in II.E. is a corollary to the alleged prosecutorial error in the first issue. To reiterate, after the prosecutor objected to defense counsel's stating what the male voice was saying on the Life Alert tape, the district judge ruled: "I think it's improper. You cannot say what you think is on the tape." Kahler contends that it was misconduct for the judge to sustain the objection and it was also misconduct for the judge to state in front of the jury that the defense argument was improper.
I agree with the majority's assessment that the district court's ruling on the State's objection during the defense closing argument was legally infirm and constituted an unassigned trial error. But, as the majority correctly states, Kahler had to show more than an erroneous ruling on an objection to establish his assigned error of judicial misconduct. He did not do so here, even with the judge's use of the word "improper" to describe the legal status of the argument.
Kahler's complaint about the judge's remarks concerning jury questions during deliberations is similarly miscast as judicial misconduct. Even if the judge's comments were erroneous, Kahler does not explain how discouraging jury questions would inevitably result in bias, prejudice, or partiality that was adverse to the defense. One can imagine that a jury could have some questions which, if left unresolved, would prejudice the State. Consequently, although I view the judge's remarks to be ill-advised and erroneous, especially in a death penalty case, I cannot say they rise to the level of being misconduct.
In sum, I concur with the majority that the record does not support the defendant's claim that the district judge engaged in a pattern of conduct that manifested bias, prejudice, or partiality against the defense. But defendant's arguments on this issue point out two unassigned errors, i.e., the district court erroneously sustained the State's objection during the defense closing argument, and the district court erroneously discouraged the jury from exercising its right, after retiring for deliberations, "to be informed as to any part of the law or evidence arising in the case." K.S.A. 22-3420(3).
Individually, the judge's erroneous instruction following defense counsel's opening statement and the two unidentified errors would not have changed the jury's guilty verdict. I discuss their cumulative prejudicial effect in Issue #7.
ISSUE #3: REQUESTED INSTRUCTION ON EXPERT WITNESSES
I agree with the majority that the district court erred in refusing to give the requested instruction on expert witness credibility, but that the error standing alone did not affect the jury's guilt-phase verdict.
ISSUE #4: CONSTITUTIONALITY OF K.S.A. 22-3220
In rejecting Kahler's constitutional challenge to this state's elimination of the insanity defense, in favor of a mens rea approach, the majority leans heavily on its assessment that Kahler adds nothing new to the arguments that were rejected in State v. Bethel , 275 Kan. 456, 66 P.3d 840 (2003). While stare decisis is a valid tack, the majority conveniently overlooks a significant distinction between this case and Bethel . Although Bethel was convicted of capital murder, the death penalty was not involved. "Pursuant to an agreement of the parties, Bethel waived his right to a jury trial, the case was tried to the bench on stipulated facts, and the State did not pursue the death penalty." 275 Kan. at 457, 66 P.3d 840.
Recently, we acknowledged that this court is supposed to employ a higher degree of scrutiny in a death penalty case. We stated:
"This court has, in several cases, noted that issues in a death penalty review are subject to a heightened reliability standard. See, e.g. , Carr , 300 Kan. at 284, 331 P.3d 544 (recognizing need for heightened reliability); State v. Scott , 286 Kan. 54, 76, 183 P.3d 801 (2008) (same); State v. Green , 283 Kan. 531, 545, 153 P.3d 1216 (2007) ( '[I]n the context of a capital sentence, this *136 court has required a heightened degree of reliability.'); Marsh , 278 Kan. at 525, 102 P.3d 445 ('[T]here is a heightened scrutiny of trial proceedings in a capital case.'); Kleypas I , 272 Kan. at 1036, 40 P.3d 139 (observing 'heightened reliability requirements' apply to capital sentencing under federal and state constitutions).
"A sentence of death is different from any other punishment, and accordingly there is an increased need for reliability in the determination that death is the appropriate sentence. See Beck , 447 U.S. at 637-38 [100 S.Ct. 2382] (recognizing that a death sentence is a ' "different kind of punishment from any other which may be imposed in this country ... in both its severity and its finality" ' [quoting Gardner v. Florida , 430 U.S. 349, 357-58, 97 S.Ct. 1197, 51 L.Ed. 2d 393 (1977) ]; court has duty to set aside procedures that undermine the reliability of the jury's determination)." State v. Kleypas , 305 Kan. 224, 274-75, 382 P.3d 373 (2016), cert. denied --- U.S. ----, 137 S.Ct. 1381, 197 L.Ed.2d 560 (2017).
At the very least, this court has the obligation to independently analyze whether the procedure of replacing the insanity defense with the mens rea approach undermines the reliability of the jury's determination to impose the death penalty. One might question whether a juror would be as likely to vote to kill a defendant who did not know that his or her murderous act was wrong.
ISSUE # 5: LESSER INCLUDED OFFENSE INSTRUCTION ON FELONY MURDER
The majority follows recent precedent to opine that the legislature retroactively eliminated felony murder as a lesser included offense of capital murder. One can certainly make a logical argument for the proposition that eliminating felony murder as a lesser offense of capital murder effectively changes the definition of the crime of capital murder, and, although the legislature is entitled to change the definition of a crime, it cannot redefine the crime after it is committed. Nevertheless, that is the settled law in this state now.
ISSUE #6: LIMITATIONS ON DEFENSE VOIR DIRE
I have no quibble with the majority's holding that the district court did not impermissibly limit the defense's voir dire of the jury panels given the record before the court and defense counsel's failure to conduct individual voir dire of venire members.
ISSUE #7: CUMULATIVE ERROR DURING THE GUILT PHASE
I discern that the following judicial acts constitute multiple guilt-phase trial errors, to-wit: (1) Giving the jury instruction after opening statements with accompanying remarks about it being unusual; (2) sustaining the State's objection during the defense closing argument, thereby precluding argument on the admitted Life Alert tape recording; (3) discouraging the jury from submitting questions during its deliberations; and (4) refusing to give the legally appropriate and factually supported expert witness instruction proffered by the defense.
Notwithstanding the existence of more than one error, I would not hold that their collective effect requires reversal of the guilty verdict. But I strongly disagree with the majority's determination that the guilt-phase errors can be ignored when considering the same jury's penalty-phase decision. Our heightened reliability obligation mandates that we not approve a sentence of death that is obtained through erroneous procedures. I would hold that the errors made in this case undermined the reliability of the jury's death sentence, and I would require that it be vacated and remanded for a new sentencing trial. A death sentence that fails the unreliable procedures test cannot pass constitutional muster, even if the majority believes that a subsequent trial would yield the same result.
ISSUE #8: EIGHTH AMENDMENT CATEGORICAL CHALLENGE TO DEATH PENALTY
The majority relies exclusively on Kleypas , 305 Kan. 224, 382 P.3d 373, to reject Kahler's argument that it is cruel and unusual punishment under the Eighth Amendment to the United States Constitution for the State to *137 kill a person who was severely mentally ill at the time of the capital murder. I did not specifically address this issue in my Kleypas dissent, but I do so now.
Fifteen years ago, in Atkins v. Virginia , 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed. 2d 335 (2002), the United States Supreme Court construed and applied the Eighth Amendment "in the light of our 'evolving standards of decency,' " and concluded that imposing the death penalty on a mentally retarded offender was excessive and "that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." While recognizing that a preferred label is intellectual disability, see Hall v. Florida , 572 U.S. ----, 134 S.Ct. 1986, 1990, 188 L.Ed. 2d 1007 (2014), in K.S.A. 2016 Supp. 21-6622, for clarity I will use the terms employed in Atkins and Kleypas , i.e., mental retardation and mentally retarded.
Part of the rationale for Atkins ' holding was that the Court seriously doubted that either of the two justifications for the death penalty that it had recognized-retribution and deterrence-could be applied to mentally retarded offenders. 536 U.S. at 318-19, 122 S.Ct. 2242 (citing Gregg v. Georgia , 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed. 2d 859 [1976] [joint opinion of Stewart, Powell, and Stevens, JJ.] ). The Court opined that "[u]nless the imposition of the death penalty on a mentally retarded person 'measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment.' " Atkins , 536 U.S. at 319, 122 S.Ct. 2242 ; cf. State v. Robinson , 303 Kan. 11, 355-56, 363 P.3d 875 (2015) (Johnson, J., dissenting) (citing Glossip v. Gross , 576 U.S. ----, 135 S.Ct. 2726, 2764-68, 192 L.Ed. 2d 761 [2015] [Breyer, J., dissenting] " 'the death penalty's penological rationale in fact rests almost exclusively upon a belief in its tendency to deter and upon its ability to satisfy a community's interest in retribution' "; if death penalty fails to reach the goals of deterrence or retribution, it is unconstitutional punishment), cert. denied --- U.S. ----, 137 S.Ct. 164, 196 L.Ed.2d 138 (2016).
In reaching its conclusion that it was "not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty," Atkins , 536 U.S. at 321, 122 S.Ct. 2242, the Court engaged in the following analysis:
"With respect to retribution-the interest in seeing that the offender gets his 'just deserts'-the severity of the appropriate punishment necessarily depends on the culpability of the offender. Since Gregg, our jurisprudence has consistently confined the imposition of the death penalty to a narrow category of the most serious crimes. For example, in Godfrey v. Georgia, 446 U.S. 420 [100 S.Ct. 1759, 64 L.Ed.2d 398] (1980), we set aside a death sentence because the petitioner's crimes did not reflect 'a consciousness materially more "depraved" than that of any person guilty of murder.' Id., at 433 [100 S.Ct. 1759]. If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution. Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate.
"With respect to deterrence-the interest in preventing capital crimes by prospective offenders-'it seems likely that "capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation," ' Enmund, 458 U.S., at 799, 102 S.Ct. 3368. Exempting the mentally retarded from that punishment will not affect the 'cold calculus that precedes the decision' of other potential murderers. Gregg, 428 U.S., at 186, 96 S.Ct. 2909. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments *138 that make these defendants less morally culpable-for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses-that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution. Thus, executing the mentally retarded will not measurably further the goal of deterrence." 536 U.S. at 319-20, 122 S.Ct. 2242.
The Kleypas majority "recognize[d] that some mental illnesses may make a defendant less culpable and less likely to be deterred by the death penalty." 305 Kan. at 336, 382 P.3d 373. Notwithstanding the self-serving equivocation in that recognition, it nevertheless points out the logical fallacy in categorically protecting the mentally retarded but not the severely mentally ill. Atkins spoke about mentally retarded offenders being less morally culpable because of their "diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses," as well as not being amenable to deterrence. 536 U.S. at 320, 122 S.Ct. 2242. I fail to grasp how a severely mentally ill person possessing those same characteristics is not in the same less-morally-culpable category as the mentally retarded offender. If a person is incapable of understanding the nature and quality of their murderous act and/or did not know that the act was wrong, does it matter whether the cause of the cognitive deficiency is labeled mental retardation or chronic mental illness? The point is that, when executing a severely mentally ill person will not "measurably advance the deterrent or the retributive purpose of the death penalty," it becomes "nothing more than the purposeless and needless imposition of pain and suffering." 536 U.S. at 319, 321, 122 S.Ct. 2242.
Kleypas strained to distinguish severe mental illness by declaring that the condition presents "less discernable common characteristics than age or mental retardation." 305 Kan. at 336, 382 P.3d 373. The apparent suggestion was that the courts might have to work more diligently to identify which mentally ill persons are less culpable. That argument is unpersuasive, if for no other reason than the notion that a person's life-even a murderer's life-should not be taken away without this court's heightened scrutiny, even if that takes more effort.
But, more importantly, I do not accept the premise. This state has decades of jurisprudence applying the M'Naghten rule. Determining whether a person was so severely mentally ill at the time of the crime as to render him or her less culpable is not much of a leap from that former knowing-right-from-wrong jurisprudence. Likewise, the argument falters when one considers that intellectual disability in this state is not determined through a mathematical calculation, but rather the condition requires a case-by-case determination as well. See State v. Corbin , 305 Kan. 619, 620, 386 P.3d 513 (2016) (remanding for district court findings on matters beyond standardized intelligence tests).
Moreover, I must confess to being baffled by the point Kleypas attempted to make by stating that "often such [mental] illnesses can be treated and may not manifest in criminal behavior." 305 Kan. at 336, 382 P.3d 373. If the suggestion is that mental retardation and being underage always manifests in criminal behavior, that would, of course, be ludicrous. The fact that not all mentally ill persons engage in criminal activity is no more compelling than the fact that not all mentally retarded persons are criminals. Moreover, if the statement means to suggest that mentally retarded persons can never receive training that will permit them to peacefully exist in society, that, too, would be wrong-headed.
Finally, Kleypas ' rationale that the problem of executing severely mentally ill persons is ameliorated because mental illness can be presented to the jury as a mitigator does not pass cursory consideration. Would telling a juror that the defendant suffers from a severe *139 mental illness that resulted in him or her killing people without knowing it was wrong, suggesting that the defendant will always be a danger to society, make the juror more, or less, likely to vote for death? If it is morally and legally wrong to execute a person who is no more culpable than Atkins' "average murderer," the decision to do so should not be left in the emotionally charged hands of the jury.
ISSUE #9: CONSTITUTIONALITY OF TWO AGGRAVATING FACTORS
I concur with the majority's determination that the issues raised here were previously decided adversely to Kahler, and I see no reason to attempt to avoid the doctrine of stare decisis today.
ISSUE #10: SUFFICIENCY OF THE EVIDENCE OF AGGRAVATING CIRCUMSTANCE
I would agree with the majority's assessment that this case presents an exception to the general proposition that shooting deaths are not inherently heinous, atrocious, or cruel. A person who stalks and systematically shoots his wife and daughters, one after the other, whereupon each remains aware of her own impending death and the deaths of her relatives has committed capital murder in a heinous, atrocious, and cruel manner.
OTHER UNASSIGNED ERRORS
Kahler does not challenge the constitutionality of Kansas' death penalty law under our State Constitution. See Kan. Const. Bill of Rights, § 9 (prohibiting "cruel or unusual punishment"). But as noted above, we can-and should-consider unassigned errors that impact on fairness and justice. In Robinson , 303 Kan. at 351-57, 363 P.3d 875, I expressed my view that the death penalty violates the prohibition against cruel or unusual punishment in our State Constitution. I relied heavily on Justice Breyer's dissent in Glossip , 135 S.Ct. at 2755-77, which I summarized as follows:
"The Glossip dissent opined that in 1976, when the United States Supreme Court upheld the death penalty, 'the Court thought that the constitutional infirmities in the death penalty could be healed,' and it 'delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems.' 135 S.Ct. at 2755 (Breyer, J., dissenting). But '[a]lmost 40 years of studies, surveys, and experience strongly indicate ... that this effort has failed.' 135 S.Ct. at 2755 (Breyer, J., dissenting). The dissent related that the current administration of the death penalty 'involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose.' 135 S.Ct. at 2755-56 (Breyer, J., dissenting). Moreover, the dissent noted that, perhaps as a result of these constitutional defects in the death penalty, 'most places within the United States have abandoned its use,' which makes the penalty 'unusual.' 135 S.Ct. at 2756 (Breyer, J., dissenting)." Robinson , 303 Kan. at 351-52, 363 P.3d 875 (Johnson, J., dissenting).
The only thing I would add here is the obvious observation that a part of what makes the death penalty unfair and unjust is that the degree of certainty that a jury must possess to vote for the death penalty does not match the finality of the punishment, once executed. A jury can convict a person of capital murder without being certain that the person is guilty. Indeed, prosecutors frequently argue to juries that the beyond a reasonable doubt standard of proof does not mean beyond all doubt. Then, in the sentencing phase, the same less-than-certain standard is applied to the existence of aggravating factors, which must then be outweighed by mitigating circumstances. K.S.A. 2016 Supp. 21-6617.
But there is nothing uncertain about the punishment of death. There is no taking back a completed execution, even if we learn that the jury was hoodwinked by unscrupulous forensics, sandbagged by unethical prosecutions, or left less than fully informed by inconceivably incompetent defense counsel. In recent years, death row inmates have been found to have been wrongfully convicted for a plethora of reasons. Moreover, after a death sentence is executed, it matters not *140 one whit whether the sentence was unconstitutionally imposed. For instance, there was no relief for all of the mentally retarded offenders put to death before the Atkins court announced that it was unconstitutionally cruel and unusual punishment to do so. Likewise, the 22 juvenile offenders put to death between 1985 and 2003 were not brought back to life by Roper 's epiphany that a state executing its children is categorically unconstitutional. See Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed. 2d 1 (2005).
In short, when it comes to our death penalty, the scales of justice are not in equipoise. That is cruel.