NOT DESIGNATED FOR PUBLICATION

No. 122,971

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DEREK ALLEN KIRKLAND,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed January 7, 2022. Affirmed in part and dismissed in part.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., SCHROEDER and CLINE, JJ.

PER CURIAM: Following a bench trial on stipulated facts, the district court convicted Derek Allen Kirkland of single counts of rape and aggravated criminal sodomy and multiple counts of sexual exploitation of a child. Kirkland appeals, arguing Kansas' insanity defense statute is unconstitutional both facially and as applied to him. Kirkland argues the statute precludes any insanity defense for strict liability crimes and that because two of his convictions were strict liability crimes, the court should have allowed him to present a defense based on lack of moral culpability. Kirkland also asserts that the district court should have allowed him to admit evidence of his mental health to show he

did not commit his crimes voluntarily as K.S.A. 2015 Supp. 21-5201(a) requires. Finally, Kirkland argues the district court erroneously denied his motion to suppress his confession. Because Kirkland failed to preserve several of these claims, we dismiss them. As to the claims Kirkland preserved, we find no error and affirm.

*Factual and Procedural Background*

Kirkland fathered a child, P.K., born in October 2008. Kirkland separated from P.K.'s mother when P.K. was a year old. But Kirkland still saw P.K. often and spent a significant amount of time with her over the next several years.

In August 2017, then-eight-year-old P.K. told her mother that Kirkland "put his penis in her vagina." P.K. indicated that Kirkland subjected her to other instances of sexual abuse, beginning around one year earlier. The next day, P.K. described the abuse she suffered to a social worker with the Kansas Department for Children and Families. Following the interview, Detective Dan Ribble located Kirkland at his home and took him to the Sedgwick County Sheriff's Office for questioning.

*Interrogation and Confession*

The video of Ribble's interview shows he took Kirkland to an interrogation room and left him there alone for around an hour. While waiting, Kirkland peeked his head out the door. Another officer came to the door and Kirkland told him that if he was not being detained, he needed to go to work. The officer did not say whether Kirkland was free to leave but went to get Ribble.

When Ribble returned to the interview room, he immediately began asking Kirkland preliminary questions. Kirkland answered Ribble's questions and did not ask

2

whether he was being detained. As a part of these preliminary matters, Kirkland told Ribble that he had slept for only three to four hours the night before.

When Ribble told Kirkland that he would need to read Kirkland his *Miranda* warnings, Kirkland asked whether he was being detained. Ribble responded:

> "Uh I mean you're . . . down here.
>
> . . . .
>
> " . . . [W]hether or not you feel you have you know you're able to leave.
>
> . . . .
>
> "You know this . . . advises you of your rights okay?
>
> . . . .
>
> "And so I want to make sure you know what your rights are and like I said I want to figure out what's going on."

Ribble then read the *Miranda* warnings and Kirkland agreed to speak to Ribble without an attorney present.

Ribble confronted Kirkland with P.K.'s allegations of sexual abuse. At first, Kirkland denied the allegations. He told Ribble he suffered from depression and suicidal thoughts and that his aunt had recently committed suicide. Kirkland then stated he heard "voices in [his] head every now and then telling [him] to do things." Right after making that statement, Kirkland maintained the voices did not instruct him to do things to P.K. But after Ribble told Kirkland he would get Kirkland help for these problems, Kirkland confessed to having images of children saved on his phone. And eventually Kirkland confessed to the other charged crimes as well.

Kirkland also told Ribble that if he did not have "some kind of outlet" and did not do as the voice instructed, he would suffer physical pain. He also claimed the voices told him to "touch [P.K.,] do things with her." The voice claimed it would "be fun" and would

3

sometimes laugh. Kirkland also told Ribble he could hear the voice laughing at him as he confessed. Seemingly as the laughter continued, Kirkland explained that he obtained sexual satisfaction from "the adrenalin[e] rush of doing more [he] kn[e]w was wrong and . . . that's the only thing [he] could do to make [the voice] go away." It is unclear which incidents Kirkland referred to, but he claimed to have an out-of-body experience during some of the incidents: "It's like . . . it was blurred but it was like I was watching it happen but I couldn't do anything about it, it's like I wasn't there it's like I was behind myself. . . . I mean it almost didn't seem real."

Near the end of the interview, Kirkland told Ribble that he believed his father had sexually abused him. He recalled a memory in which his father forced him to shower with him. Kirkland maintained he began hearing voices a few years after that incident. Concluding the interview, Ribble asked Kirkland what the voices were saying to him at that moment. Kirkland replied:  "That I did nothing wrong but I know I did. Every time I say I know I did it laughs at me. It keeps trying to convince me that it's not real it's just who I am but I know it's not. I don't know what to do."

Kirkland's interview lasted around three hours. When it ended, Ribble placed Kirkland under arrest. Police executed a search warrant after Kirkland's confession and found at least 17 images of child pornography on Kirkland's phone.

*Pretrial Proceedings*

The State initially charged Kirkland with one count each of rape of a child under 14 under K.S.A. 2015 Supp. 21-5503(a)(3); aggravated criminal sodomy with a child under 14 under K.S.A. 2015 Supp. 21-5504(b)(l); and sexual exploitation of a child under K.S.A. 2015 Supp. 21-5510(a)(2). The State later amended its complaint to include another 16 counts of sexual exploitation of a child.

4

Kirkland's defense counsel requested a competency evaluation to determine whether Kirkland was competent to stand trial. The district court granted the request and suspended proceedings pending the completion of an evaluation at the Larned State Security Hospital. Dr. Roy Daum's competency report found Kirkland competent to stand trial. Based on the report, the district court found Kirkland competent to stand trial and reopened Kirkland's case.

Kirkland filed two pretrial motions. The first asked the district court to find K.S.A. 2015 Supp. 21-5209 unconstitutional because it permits an insanity defense only to negate whatever intent the charged crime requires. Kirkland also asked the district court to dismiss the State's charges for rape and aggravated criminal sodomy—counts one and two of the State's complaint. In an amended motion, Kirkland argued the statute violated his due process rights under the federal Constitution because it did not allow him to pursue a defense to his strict liability crimes. In his reply brief, Kirkland maintained that K.S.A. 2015 Supp. 21-5209 was unconstitutional as applied to counts one and two of the State's complaint.

The State responded that Kirkland lacked standing to raise a constitutional challenge because he had proffered no evidence showing he could not form intent because of mental disease or defect. The State also denied that aggravated criminal sodomy was a strict liability offense and generally argued the statute was constitutional.

Kirkland's second motion argued that his statements to Ribble were involuntary and should be suppressed. Kirkland focused mainly on his mental health, claiming he had suffered from delusions, psychosis, and schizoaffective disorder when speaking to Ribble. Kirkland also pointed out that he had not slept, that he had not received an adequate answer about his detention status, and that Ribble had deceived him by claiming he wanted to help him.

5

The district court held a combined motions and preliminary hearing. Daum testified about Kirkland's mental health. Daum explained that he did not know whether Kirkland had been in active psychosis during Ribble's interrogation, but he had diagnosed Kirkland with schizoaffective disorder, posttraumatic stress disorder, personal history of sexual abuse, and alcohol and cannabis use disorders. Daum testified that Kirkland had "a horrific childhood background" including his father raping and sodomizing him. Daum also explained that while he did his evaluation, Kirkland had experienced active hallucinations that manifested as voices commanding him to harm others.

The district court denied both motions. The court held that Kirkland's motion to find K.S.A. 2015 Supp. 21-5209 unconstitutional failed as a matter of law based on the holdings in *State v. Kahler*, 307 Kan. 374, 410 P.3d 105 (2018), *cert. granted* 139 S. Ct. 1318 (2019), and *State v. Bethel*, 275 Kan. 456, 66 P.3d 840 (2003). The United States Supreme Court later affirmed the Kansas Supreme Court in *Kahler v. Kansas*, 589 U.S.__, 140 S. Ct. 1021, 206 L. Ed. 2d 312 (2020) (finding that due process does not require Kansas to adopt an insanity test turning on a defendant's ability to recognize that one's crime was morally wrong). The district court acknowledged that Kirkland suffered from mental health issues but found they did not affect him during his interview to a degree that would render his statements involuntary. And the district court found that because Kirkland had made his statements to Ribble voluntarily, his confession was admissible.

*Trial and Sentencing*

Kirkland then waived his right to a jury trial and agreed to a bench trial on stipulated facts. Those facts established that Kirkland confessed to committing each of the charged crimes, and that Kirkland stated during his confession that he heard voices in his head telling him to touch P.K. and to not rest until he did what the voices told him to do.

6

The district court found Kirkland guilty and convicted him of all crimes charged. At sentencing, Kirkland requested a downward durational departure, citing his mental health as a substantial and compelling reason to impose a determinative, on-grid sentence. But the district court denied that request and imposed a hard-25 life sentence for his rape and aggravated criminal sodomy convictions, plus another 32-month term of imprisonment for his 17 solicitation of a child convictions.

Kirkland timely appeals.

*Is K.S.A. 2015 Supp. 21-5209 Unconstitutional as Applied to Kirkland?*

Kirkland first raises an as-applied constitutional challenge to K.S.A. 2015 Supp. 21-5209, arguing the statute unconstitutionally prevented him from presenting an insanity defense for his strict liability crimes. That statute states:

> "It shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the crime charged. Mental disease or defect is not otherwise a defense." K.S.A. 2015 Supp. 21-5209.

Kirkland acknowledges that this statute allows evidence of mental disease or defects only to negate mental culpability. But Kirkland contends that due process requires some form of an insanity defense for every defendant, so a defendant charged with a strict liability crime, which requires no mental culpability, should have a right to rely on a moral culpability defense.

The State concedes that rape under K.S.A. 2015 Supp. 21-5503(a)(3) is a strict liability crime, but it contends that Kirkland received due process because he presented evidence of his mental illness at sentencing. But the State denies that aggravated criminal

7

sodomy is a strict liability offense and asks us to dismiss that portion of Kirkland's claim. Citing *Kahler*, 140 S. Ct. at 1037, the State also contends that because Kirkland was not entitled to a defense turning on moral culpability, he cannot show reversal is warranted here.

Before addressing these claims, we must first consider whether we have jurisdiction to consider Kirkland's as-applied challenge and whether he adequately preserved this issue.

*Jurisdiction*

The State contends that Kirkland lacks standing to raise a constitutional challenge to K.S.A. 2015 Supp. 21-5209. Standing is a component of subject matter jurisdiction, which a party may raise for the first time on appeal. *State v. Gilbert*, 292 Kan. 428, 431, 254 P.3d 1271 (2011). The State argues that Kirkland lacks standing because "he does not argue that he lack[ed] the cognitive capacity to form criminal intent." Kirkland admits he does not understand the State's position but contends the application of the statute directly caused his loss of a fundamental right to present some type of an insanity defense.

Underlying the dissonance between the parties' standing arguments is a procedural error Kirkland made in the district court. Kirkland never filed a notice of intent to rely on an insanity defense. See K.S.A. 22-3219(1) ("Evidence of mental disease or defect excluding criminal responsibility is not admissible upon a trial unless the defendant serves upon the prosecuting attorney and files with the court a written notice of such defendant's intention to assert the defense that the defendant, as a result of mental disease or defect lacked the mental state required as an element of the offense charged."). Instead, Kirkland moved to find K.S.A. 2015 Supp. 21-5209 unconstitutional and then proceeded as if the district court would preclude any evidence related to his mental illness unless he

8

succeeded on that motion. And although the district court upheld K.S.A. 2015 Supp. 21-5209 as constitutional, citing our Supreme Court's opinions in *Bethel* and *Kahler*, it did not explain its decision or the applicability of that statute in strict liability cases. Yet neither party requested additional findings from the district court.

Still, Kirkland's failure to file notice of intent to rely on an insanity defense does not show that Kirkland lacks standing. As a prerequisite to attacking the constitutionality of a statute, an appellant must show personal harm from the statute's application. See *State v. Stoll*, 312 Kan. 726, 734, 480 P.3d 158 (2021) (quoting *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 [2013]. A "'litigant establishes a cognizable injury when the litigant establishes 'a personal interest in a court's decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct.'" *Stoll*, 312 Kan. at 734. "A party cannot raise a challenge to statute's constitutionality if the claimed defect does not apply to that party." *State v. Gleason*, 305 Kan. 794, Syl. ¶ 5, 388 P.3d 101 (2017).

True, the insanity defense provided in K.S.A. 2015 Supp. 21-5209's first sentence (establishing an insanity defense when the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the crime charged) did not apply to Kirkland's strict liability crimes, because they require no culpable mental state. But the second sentence of the statute (stating that mental disease or defect is not otherwise a defense) prohibits all other insanity defenses. So by denying Kirkland's motion to find the statute unconstitutional, the district court effectively prevented him from pursuing a moral culpability defense. That constitutes personal harm, giving Kirkland standing to raise this claim.

*Preservation*

We next determine whether Kirkland preserved his as-applied challenge to our insanity statute. Preservation issues are subject to unlimited review. See *State v. Swint*, 302 Kan. 326, 335-36, 346-47, 352 P.3d 1014 (2015) (applying de novo standard in review of this court's conclusions on preservation and abandonment). Normally issues not raised before the district court cannot be raised on appeal. *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Yet parties may raise constitutional issues for the first time on appeal if they successfully argue that a recognized exception applies. "'To preserve an issue for appellate review . . . it must be accompanied by argument and supported by pertinent authority or an explanation why the argument is sound despite the lack of authority or existence of contrary authority.' *Swint*, 302 Kan. at 346." *State v. Alvarez*, 309 Kan. 203, 209, 432 P.3d 1015 (2019). Still, even when a party fully argues why we should apply an exception, the decision to review an unpreserved claim remains a prudential one for the court. *State v. Gray*, 311 Kan. 164, 169, 459 P.3d 165 (2020).

When Kirkland moved the district court to find K.S.A. 2015 Supp. 21-5209 unconstitutional, he argued the statute violated his substantive and procedural due process rights because it abolished the insanity defense for strict liability crimes. But Kirkland did not state that he was raising an as-applied challenge to the statute. And the court denied his request to find the statute unconstitutional without addressing the nature of strict liability crimes or Kirkland's particular circumstances or mental condition. The circumstances show that the district court treated Kirkland's motion as raising only a facial challenge. Still, Kirkland did not ask the district court to provide additional findings or clarification to allow appellate review. And our Supreme Court has repeatedly emphasized that it is the defendant's responsibility to ensure the district court makes the factual findings necessary for appellate review. See, e.g., *State v. Patterson*, 311 Kan. 59, 72, 455 P.3d 792 (2020); *State v. Cervantes-Puentes*, 297 Kan. 560, 565, 303 P.3d 258

10

(2013) (same). This responsibility goes beyond merely raising a constitutional claim. *State v. Espinoza*, 311 Kan. 435, 437, 462 P.3d 159 (2020).

As a result, the record does not show what, if any, consideration the district court gave to this issue. We find Kirkland did not raise the issue to the district court as an as-applied challenge to the constitutionality of K.S.A. 2015 Supp. 21-5209. Classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be shown and the corresponding breadth of the remedy. *State v. Hinnenkamp*, 57 Kan. App. 2d 1, 4, 446 P.3d 1103 (2019) (denying review of the appellant's unpreserved facial challenge) (quoting *Bucklew v. Precythe*, 587 U.S. __, 139 S. Ct. 1112, 1127, 203 L. Ed. 2d 521 [2019]), *rev. denied* 312 Kan. 897 (2020). Unlike a facial challenge to a statute, an as-applied challenge "contests that application of a statute to a particular set of circumstances" and thus "'necessarily requires findings of fact.' See *State v. Farmer*, No. 98,997, 2008 WL 5401338, at *4 (Kan. App. 2008) (unpublished opinion)." *Hinnenkamp*, 57 Kan. App. 2d at 4. When, as here, the district court has not made those findings of fact, we may find the as-applied issue unpreserved for appeal. See, e.g., *Hinnenkamp*, 57 Kan. App. 2d at 5. Because the record lacks the factual findings necessary to our review of as as-applied challenge, we dismiss Kirkland's as-applied challenge to K.S.A. 2015 Supp. 21-5209 as unpreserved. Cf. *Espinoza*, 311 Kan. at 437-38 (finding as-applied challenge to the constitutionality of a sentence not amenable to appellate review because defendant did not object to district court's failure to make factual findings at sentencing and failed to move for findings under Kansas Supreme Court Rule 165 [2020 Kan. S. Ct. R. 215]).

Kirkland argues that we may still consider his claim under two exceptions to the general preservation rule: that his newly asserted theory is a question of law arising on admitted facts and is finally determinative of this case; and that review is necessary to serve the ends of justice or prevent the denial of his fundamental rights. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (listing commonly recognized reasons

courts apply to consider unpreserved claims). And we could do so, but the decision to review an unpreserved claim is prudential. *Gray*, 311 Kan. at 169. In short, because Kirkland failed to raise and develop his constitutional challenge before the trial court, we lack the necessary factual and legal analysis in the record to adequately address his as-applied constitutional challenge. This court does not make factual findings; it reviews those made by district courts. *State v. Hutto*, 313 Kan. 741, 746, 490 P.3d 43 (2021); see *State v. Vonachen*, 312 Kan. 451, 457-58, 476 P.3d 774 (2020) (dismissing as unpreserved defendant's claim that K.S.A. 2019 Supp. 21-5209 unconstitutionally prevented him from raising a moral culpability defense because defendant failed to get the necessary factual findings or show his claims implicated a fundamental right).

Kirkland maintains that the facts we need to decide this issue are apparent in the record. True, the State charged Kirkland with a strict liability offense, but that is not the only fact Kirkland relies on. Instead, Kirkland maintains that the court should have permitted him to rely on a moral culpability defense. But our review of the record shows conflicting or inadequate evidence about whether that type of defense would have been factually appropriate, even assuming it was legally appropriate. We offer two examples to support that conclusion. First, although Kirkland told Ribble that he committed his crimes because a voice in his head directed him to, he also admitted to Ribble that he knew what he did was wrong, he admitted remorse and disgust for his actions, and he said he found sexual satisfaction in committing acts he knew were wrong. Second, Kirkland relied only on Daum's evaluation which was solely to determine Kirkland's competency to stand trial and not to proffer evidence of Kirkland's insanity under a moral culpability standard. Daum did not opine whether Kirkland was insane under any test. Nor did Kirkland proffer any evidence that he lacked the ability to know right from wrong, i.e., lacked moral capacity.

These unresolved matters show that Kirkland's as-applied challenge rests on undeveloped or contradicted facts and does not raise a purely legal question. This court

does not engage in the type of fact-finding needed here. See *State v. Allen*, 314 Kan. 280, __, 497 P.3d 566, 571 (2021) (Reversing Kansas Court of Appeals decision to decide unpreserved issue based on exceptions where the "limited appellate record reflects unresolved factual representations material to those issues' consideration. And this undeveloped record is not the State's fault because Allen never raised these claims with the district court where they could be properly fleshed out."); *State v. McMullen*, 290 Kan. 1, 4, 221 P.3d 92 (2009) (appellate court does not reweigh evidence, resolve conflicting evidence, or assess the credibility of the witnesses).

Finally, Kirkland asserts that the panel should not dismiss this issue as unpreserved because the State did not challenge it as unpreserved, citing *State v. Valdiviezo-Martinez*, 313 Kan. 614, 624, 486 P.3d 1256 (2021). There, the Kansas Supreme Court addressed the requirement that a defendant must raise a statute of limitations defense at trial to avoid waiving the defense and to preserve it for appeal. But the State had not argued on appeal that the defendant had waived its statute of limitations defense at trial—it raised no preservation or any other procedural concern. Kirkland apparently relies on the following language:

> "And, if an issue is not jurisdictional, a party waives it by failing to raise it before the Court of Appeals or in a petition or cross-petition for review of a Court of Appeals' decision, even if the issue itself relates to preservation. See *State v. Boeschling*, 311 Kan. 124, 128, 458 P.3d 234 (2020). This means the State waived any preservation argument." 313 Kan. 624.

But Kirkland takes this holding out of context. This decision was based on Rule 8.03(b), (h)(1) (2018 Kan. S. Ct. R. 53), which governs our Supreme Court's review of this court's decisions. See *State v. Boeschling*, 311 Kan. 124, 128, 458 P.3d 234 (2020). Because the State had not raised the waiver issue to the Kansas Court of Appeals, and had not cross-petitioned on that issue, the issue was not properly before the Kansas

13

Supreme Court on the defendant's petition for review. But under *Gray*, 311 Kan. at 169, the State's position before us does not preclude our exercise of discretion not to reach an unpreserved issue. We thus dismiss Kirkland's as-applied challenge as unpreserved.

*Is K.S.A. 2015 Supp. 21-5209 Facially Unconstitutional?*

Kirkland next raises a facial challenge to K.S.A. 2015 Supp. 21-5209, our insanity defense. He concedes that the Kansas Supreme Court decided some of his substantive due process arguments against him in *Kahler* but argues that two of his arguments—rooted in sections 1 and 5 of the Kansas Constitution Bill of Rights—have never been decided.

The State responds that this issue is unpreserved, and Kirkland admits that he did not raise his arguments regarding sections 1 and 5 of the Kansas Constitution Bill of Rights in the district court. He thus has no right to raise them on appeal. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018) (discussing general rule that constitutional claims cannot be raised for the first time on appeal). And although Kirkland asserts exceptions to show appellate review is appropriate, we decline to apply those exceptions here. See *State v. Harris*, 311 Kan. 371, Syl. ¶ 1, 461 P.3d 48 (2020) ("Generally, an appellate court does not address issues for the first time on appeal, but there are limited exceptions within defined parameters."); *Gray*, 311 Kan. at 169.

Kirkland concedes that the only portion of his facial challenge that is adequately preserved for appellate review is the one already considered in *Kahler*. Kirkland argued to the district court that K.S.A. 2015 Supp. 21-5209 violates his substantive due process rights, so the court had to permit him to use the right-from-wrong rule, or moral culpability test, commonly called the *M'Naghten* test.

But Kirkland concedes that the Supreme Court decided this argument against him in *Kahler*:

"[C]onstitutionalizing the moral-incapacity standard, as Kahler requests, would require striking down not only the five state laws like Kansas's . . . , but 16 others as well . . . . And with what justification? The emergence of *M'Naghten*'s legal variant, far from raising a due process problem, merely confirms what *Clark* already recognized. Even after its articulation in *M'Naghten* (much less before), the moral-incapacity test has never commanded the day. *Clark*, 548 U.S. at 749.

. . . .

"We therefore decline to require that Kansas adopt an insanity test turning on a defendant's ability to recognize that his crime was morally wrong. Contrary to Kahler's view, Kansas takes account of mental health at both trial and sentencing. It has just not adopted the particular insanity defense Kahler would like. That choice is for Kansas to make—and, if it wishes, to remake and remake again as the future unfolds. No insanity rule in this country's heritage or history was ever so settled as to tie a State's hands centuries later." 140 S. Ct. at 1036-37.

See *Bethel*, 275 Kan. at 473 ("We conclude that the affirmative insanity defense is a creature of the 19th century and is not so ingrained in our legal system to constitute a fundamental principle of law.").

In short, to the extent Kirkland preserved his claim that K.S.A. 2015 Supp. 21-5209 is facially unconstitutional, that claim is defeated by *Kahler* and *Bethel*.

*Did the District Court Err in Excluding Evidence about Kirkland's Mental Health to Negate the Actus Reus Element of His Crimes?*

Kirkland next contends that the district court should have allowed him to present evidence of his mental disease or defect to prove he did not commit a voluntary act as required under K.S.A. 2015 Supp. 21-5201(a). That statute provides: "A person commits

15

a crime only if such person voluntarily engages in conduct, including an act, an omission or possession."

But, as above, Kirkland failed to preserve this issue for appeal. He admits that he did not raise this issue in the district court and failed to proffer any evidence showing that a mental disease or defect prevented him from acting voluntarily as defined by the statute. So the record lacks the findings necessary for us to determine whether this defense was factually appropriate. We agree with the State that because this issue is evidentiary, we should not consider it for the first time on appeal. See *Gray*, 311 Kan. at 169; *State v. Bliss*, 61 Kan. App. 2d 76, 93-96, 498 P.3d 1220 (2021). Kirkland failed to raise this issue in the district court, and although Kirkland argues exceptions, save his failure to preserve this issue, we find it unwise to apply them. We thus dismiss Kirkland's claim under K.S.A. 2015 Supp. 21-5201(a) as unpreserved.

*Did the District Court Err in Denying Kirkland's Request to Suppress His Statements as Involuntary?*

Finally, Kirkland contends that the district court should have suppressed his statements to Ribble because he made them involuntarily as the result of mental illness.

Appellate courts review the factual underpinnings of a district court's decision on a motion to suppress evidence for substantial competent evidence and its ultimate legal conclusion de novo. But this court does not reweigh evidence, assess witness credibility, or resolve conflicting evidence. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014).

The State bears the burden to show that defendant's incriminating statements were freely and voluntarily given:

16

"When challenged, the State has the burden to prove by a preponderance of the evidence that a defendant's incriminating statements were freely and voluntarily given. And to determine that, a trial court typically looks at the totality of the circumstances surrounding the statements and considers the following nonexclusive factors: (1) defendant's mental condition; (2) the interview's manner and duration; (3) defendant's ability to communicate on request with the outside world; (4) defendant's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) defendant's fluency with the English language." *Vonachen*, 312 Kan. at 464.

Kirkland challenges the district court's findings under factors one, two, three, and five, but he concedes that factors four and six favor the State's position.

*Factor 1 - Defendant's Mental Condition*

Kirkland suggests reversal is warranted based on his mental condition alone. Kirkland argues the district court should have assumed his statements were not voluntary because he told Ribble he was "actively suffering from mental-health issues, specifically depression and suicidal thoughts."

But our Supreme Court rejected a similar argument in *Bethel*:

"Bethel's position as stated in his brief is that he 'was insane at the time of the interview,' and, as a result, under Kansas law his statements should have been suppressed. Bethel's contention, however, is at odds with established law of this state. 'Mental disability alone is not determinative of voluntariness' of a confession. *State v. Caenen*, 270 Kan. 776, Syl. ¶ 3, 19 P.3d 142 (2001). In all cases, including cases of mental disorders or illness, where the voluntariness of a confession is at issue, the totality of the circumstances is examined. 270 Kan. at 783-84." 275 Kan. at 475.

The existence of a mental health diagnosis does not necessarily render statements involuntary. See *State v. Woods*, 301 Kan. 852, 867, 348 P.3d 583 (2015) (noting prior

17

schizophrenia diagnosis yet holding "there is no evidence [the defendant's] responses were unknowing or involuntary because he was suffering from schizophrenia"); *State v. Edwards*, 291 Kan. 532, 547, 243 P.3d 683 (2010) (declining to "opine that a person with bipolar disorder who is suffering a major depressive episode cannot freely, voluntarily, and knowingly give a statement to the police" when no such evidence was presented in the district court).

The district court considered Kirkland's mental condition before denying his motion to suppress. In its lengthy analysis, the district court acknowledged that Kirkland suffered from mental health issues but determined that under the circumstances, those issues did not prevent him from acting knowingly and voluntarily:

"Essentially what the Court is looking at is to see if the defendant's statements are knowing and voluntary. And so first, the Court must look at the defendant's mental condition. This is probably essentially the thrust of the defense's position. I would readily acknowledge that in the video that Mr. Kirkland was crying. I don't find that to be necessarily an indication of a mental health issue as much as just perhaps the stress of being interrogated by the police. Perhaps it was the stress of coming to grips with some of the statements that he had made with regard to his behavior, but the crying itself is not a mental health—does not indicate a mental health condition.

"Dr. Daum did make a diagnosis of Mr. Kirkland. But I think it was Dr. Daum's statements during his testimony and it would secondly be the position of this Court that the diagnosis in and of itself is not the end of the analysis. The video does not show any behavior that leads this Court to believe that Mr. Kirkland was suffering from delusions or hallucinations. I'm not ignoring, of course, his statements. I will readily acknowledge that he stated that he was hallucinating with regard to hearing a voice that was directive.

"I will readily acknowledge that he stated that he had been awake for 15 hours, although I don't find that too compelling in that if a person slept for eight hours a day, they will be awake for longer than that. But during his statements in the video the

18

defendant was lucid, rash, alert and was responding appropriately to questions. I believe that happening was used in the analysis in the <u>Bethel</u> case.

"He was not reacting to unseen stimuli. His hallucinations in this case were self-reported not only in the interview but also to Dr. Daum. I thought it was interesting that in my analysis of the report that was attached to defense motion [and] in my listening to Dr. Daum that he didn't seem able to verify that this behavior, specifically the hallucinations and delusions, would support a diagnosis of some sort of psychotic behavior or psychosis that was observed by others.

"In fact, his behavior while at Larned during the evaluation process did not indicate that [behavior was not observed] while he was . . in the dormitory type arrangement during the analysis process. So I cannot find that his mental health diagnosis in and of itself would prevent him from making statements that were knowing and voluntary.

"One other thing troubling to me is in Dr. Daum's analysis or his report, pardon me, he states that there was a large amount of alcohol and illegal drugs taken by Mr. Kirkland. Mr. Kirkland self-reports this. Dr. Daum cites this intake of drugs and alcohol in his report, but what I could not find in his report was how that might affect Mr. Kirkland's mental health and how . . . the lack of that during his incarceration and during his hospitalization and recover[y] . . . would affect his mental condition.

"I would expect Mr. Kirkland to be more lucid, think more clearly, those type of things when he is not taking in large amounts of alcohol or illegal drugs. So I am satisfied that his mental health condition, the diagnosis itself and the testimony of Dr. Daum did not convince this Court that the mental condition would prevent him from making knowing and voluntary statements."

The record adequately supports these findings. The video of the interview shows Kirkland was crying and telling Ribble that he could hear a directive voice during his interview, but Kirkland did not react to the voice in a way that would imply his confession was involuntary. Ribble testified that Kirkland did not seem distracted and

19

that he instead actively engaged in the conversation. Ribble also testified that Kirkland did not seem to be under the influence of drugs or alcohol during his interview. And Kirkland told Ribble he had taken no medications before the interview.

Finally, Daum testified that Kirkland's diagnoses were based at least in part on Kirkland's personal statements. Daum's testimony about the techniques used by the psychologists and psychiatrists that examined Kirkland suggests he had more confidence in the accuracy of the testing process than the district court appeared to have in its consideration of this factor. Still, the record shows the district court considered Daum's diagnoses, Kirkland's statements to Ribble about the voice in his head, and Kirkland's lack of sleep in determining the voluntariness of Kirkland's confession.

The bottom line is that Kirkland fails to explain how his diagnoses render him more susceptible to coercion. In *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), the United States Supreme Court clarified that "police overreaching" is an "integral element" to finding a confession involuntary under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. It held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." 479 U.S. at 167. The Kansas Supreme Court has "recognized *Connelly* as controlling precedent," including *Connelly*'s holding that "'while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry.'" *State v. Barrett*, 309 Kan. 1029, 1044, 442 P.3d 492 (2019). In other words, without coercive police activity, a statement cannot be "rendered involuntary based on [a defendant's] mental condition alone." 309 Kan. at 1044-45. Because Kirkland shows no coercive acts by the State, this factor supports the district court's finding.

*Factor 2 - Interview's Manner and Duration*

Kirkland maintains that he suffered severe stress because of the overall duration of the interview and the long time he was left alone in the interview room.

The interview lasted around 3 hours and Kirkland sat alone for 70 of those minutes. That is not an unduly long time. See *State v. Walker*, 308 Kan. 409, 422, 421 P.3d 700 (2018) (finding three and a half hours shorter than many other periods of interrogation found voluntary); *State v. Harris*, 293 Kan. 798, 809, 269 P.3d 820 (2012) (finding a confession voluntary when a defendant sat in the interview room for a little over 3 hours before being questioned for 90 minutes); *State v. Brown*, 258 Kan. 374, 392-95, 904 P.2d 985 (1995) (finding a confession voluntary when defendant was in custody for four hours before being questioned by officers for at least an hour). Nor did Kirkland present evidence to establish he suffered severe stress or that stress "probably made [his] hallucinations more vivid."

In its review, the district court correctly noted the duration of the interview and the fact that Ribble left the room several times. The record also supports the district court's findings that Ribble was the only person in the room with Kirkland, that he did not coerce or intimidate Kirkland, and that he offered Kirkland food, water, and bathroom breaks. As the district court found, this factor favors the voluntariness of Kirkland's statements.

*Factor 3 - Ability to Communicate with Outside World*

Kirkland next argues that he was prevented from communicating with the outside world.

But Kirkland never asked to communicate with anyone outside the interview room or sheriff's office. Although Kirkland told an officer that he needed to go to work if he

21

was not being detained, he never asked to leave. Moreover, Ribble told Kirkland that he was free to leave. While isolation from the outside world is one of the factors we consider in determining whether an interview was coerced, "it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation." *State v. Walker*, 283 Kan. 587, 598, 153 P.3d 1257 (2007). We find no error here.

*Factor 5 - Officer's Fairness in Conducting the Interview*

In determining that Ribble conducted the interview fairly, the district court found that Ribble never tried to intimidate or frighten Kirkland. And Kirkland did not show that he felt intimidated or threatened. Kirkland does not challenge these findings. He instead focuses on Ribble's vague response to his question about his detention status and Ribble's insincere statements that he wanted to help Kirkland.

Ribble's response to Kirkland's question whether he was being detained, while arguably improper, did not impact the overall fairness of Ribble's conduct. Ribble truthfully informed Kirkland of the purpose of his questioning before and during the interview. And Ribble's statement that he would get Kirkland help, whether sincere or not, would not alone render Kirkland's confession involuntary. See *State v. Wakefield*, 267 Kan. 116, 127, 977 P.2d 941 (1999) (misrepresentations made by interrogating officers do not render a confession involuntary "so long as the defendant's statements were the product of his or her free and independent will"). And even combined with Ribble's other statement, this comment does not show Kirkland misunderstood the purpose of the interview or Ribble's role in gathering evidence related to P.K.'s allegations. Viewing the totality of circumstances, we find no unfairness in how Ribble conducted the interview.

*Conclusion*

Under the totality of the circumstances presented, we find no error in the district court's findings or conclusion that Kirkland made his incriminating statements voluntarily. Cf. *Vonachen*, 312 Kan. at 465-66 (upholding admission of confession given by juvenile defendant diagnosed with mental illnesses, but without specifically addressing mental illness in suppression analysis); *Bethel*, 275 Kan. at 477 (affirming district court's denial of motion to suppress mentally ill defendant's confession based on appellate review of videotaped interrogation). We thus affirm the district court's admission of Kirkland's statements.

Affirmed in part and dismissed in part.